| STATE OF LOUISIANA | * | NO. 2024-KA-0244 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| KENDALL GORDON | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 555-162, SECTION "H"
Honorable Camille Buras, Judge
* * * * * *
**Judge Roland L. Belsome**
* * * * * *

(Court composed of Judge Roland L. Belsome, Judge Sandra Cabrina Jenkins, Judge Karen K. Herman)

**JENKINS, J., CONCURS IN THE RESULT.**
**HERMAN, J., DISSENTS AND ASSIGNS REASONS.**

Leo J. Palazzo
Mario A. Arteaga, Jr.
732 Behrman Highway
Suite F & G
Gretna, LA 70056

    COUNSEL FOR PLAINTIFF/APPELLANT

Elizabeth Baker Murrill
Louisiana Attorney General
J. Taylor Gray
J. Bryant Clark, Jr.
Assistants Louisiana Attorney General
P. O. Box 94005
Baton Rouge, LA 70804

Jason Rogers Williams
Orleans Parish District Attorney
Brad Scott
619 S. White Street
New Orleans, LA 70119

    COUNSEL FOR DEFENDANT/APPELLEE

                **REVERSED AND REMANDED.**
                   **JANUARY 29, 2025**

RLB

Kendall Gordon ("Gordon") appeals the denial of his Petition for Compensation for Wrongful Conviction.  The trial court held that Gordon "failed to prove by clear and convincing evidence that he is factually innocent of the crime for which he was convicted."  For the reasons that follow, we reverse that judgment and remand to the trial court for assessment of compensation due to Gordon in accord with La. R.S. 15:572.8.

***Procedural history***

Patrice Comadore ("Patrice") was murdered on August 8, 2009.  Gordon was charged with the crime and was convicted after a one-day bench trial in June 2010. The trial court sentenced him to life in prison without possibility of parole in August 2010. His conviction was affirmed on appeal by this court and the Louisiana Supreme Court. The United States District Court for the Eastern District of Louisiana denied Gordon's petition for habeas corpus.  The federal Fifth Circuit Court of Appeals affirmed that denial.

Gordon filed an application for post-conviction DNA testing in April 2019. In response, the trial court found that Gordon was entitled to have specific items of physical evidence tested for DNA residue. Based on the results of the DNA testing

1

and other factors discussed more fully below, the trial court vacated Gordon's conviction in December 2021.

Gordon filed the petition for compensation that is the subject of this appeal on August 10, 2022. The case was presented largely on stipulated facts and documents submitted to the court. After considering the evidence and the law, the trial court denied the petition without formal written reasons. La. R.S. 15:572(A)(2) required Gordon to prove by "clear and convincing scientific or non-scientific evidence that he is factually innocent of the crime for which he was convicted." In the trial court's judgment, Gordon had not met his burden of proof.

In this appeal, Gordon argues that the trial court erred in its interpretation and application of the "clear and convincing" standard of proof as required by La. R.S. 15:572.8 and jurisprudence defining the petitioner's burden under the statute. We agree.

### *Patrice Comadore's murder*

According to all accounts in the record, Patrice and her sister Darceleen Comadore ("Darceleen") were at home with their friend Earlitta Taylor ("Taylor") and her four children on the night Patrice was killed. Two men, who wore bandanas to cover their faces, kicked in the front door about 10 p.m. At that time, Darceleen was in the living room, Patrice was in the bedroom, and Taylor and her children were in the kitchen. The gunmen ordered everyone to get face down on the floor. The men demanded money and car keys from Taylor but got nothing from her. They proceeded to Patrice's bedroom where Darceleen and Taylor could both hear but not see what was happening. Both women reported hearing gunfire. According to Darceleen's testimony, one of the assailants was yelling profanities at the other in the bedroom. Darceleen, who was still lying face down on the floor at

that time, testified that one of the intruders threw the other out of Patrice's room and he landed on top of her. The scuffle between the two men caused the bandana to fall, briefly, from the face of the man who fell on her. Darceleen thought she recognized that man as Gordon. She knew him from encounters in her neighborhood.[1] In her statement and sworn testimony, Darceleen said she was not sure about what had happened in Patrice's bedroom but she immediately concluded that the man who fell on her had been shot. He had a great deal of blood on him and he had smeared it onto her clothes.

Detective Barret Morton ("Det. Morton") interviewed Darceleen at the New Orleans Police Department Homicide Office approximately four hours after this violent encounter. She told the detective that the robbers forced her at gunpoint to get up from the floor to retrieve her money and car keys. It was only after Darceleen entered Patrice's bedroom that she saw her sister had been shot and killed. One of the intruders beat her repeatedly until she produced $200 in cash and a set of car keys.[2] The two attackers left the house as soon as Darceleen gave them the money. Darceleen told Det. Morton that she was engaged in a telephone conversation with her mother when the two men broke through the front door. From her testimony, it appears that Darceleen did not terminate the call. She resumed speaking to her mother as soon as the killers were gone. At the time she spoke with Det. Morton, Darceleen could not recall if she called police or asked her mother to call them.

---

[1] Both Darceleen and Taylor testified that both men were wearing bandanas to cover their faces. According to Taylor, one of the men wore a red bandana. Darceleen described only one of the bandanas, which she said was black.

[2] Darceleen could not locate her own purse in the midst of the commotion, so she turned over $200 and car keys from Taylor's purse.

*The investigation*

According to testimony at Gordon's murder trial, police arrived shortly after they received the 911 call. In the house, they found a blood trail leading from the hallway adjacent to Patrice's bedroom to the front door. A forty-caliber handgun containing a magazine with 12 unspent cartridges lay on the floor just outside the children's bedroom. Two nine-millimeter casings from a second gun were recovered at the scene. One of the casings was found in a pool of Patrice's blood.

About a half hour after police reported to the Comadore scene, another 911 call led police to the site of gunshot death three miles away. Police found Jessie Bibbins ("Bibbins") on the front steps of a residence owned by one of Bibbin's maternal relatives.

Meanwhile, police drove Darceleen to their homicide department office on Broad Street. Det. Morton interviewed Darceleen and showed her two photo lineups. In a highly disjointed interview, Darceleen told Morton that she was certain that Gordon was the person who was shot in the course of the robbery and murder at her home. Darceleen also positively identified Gordon in the photo lineup where he appeared. She had also described Gordon before the lineup, even to the point of recalling that he had tattoos on his face and a gap in his front teeth. Critically to our analysis, Darceleen did not tell Det. Morton that she had seen the tattoos on the night of the crimes. Darceleen could not identify anyone in a second photo lineup as the robber who was the presumptive shooter.

In the course of Det. Morton's interview, Darceleen described one of the culprits as "younger than me." Unfortunately, this description took on a life of its own, leading investigators, lawyers and the courts to begin describing the two perpetrators as the "younger one" and the "older one." Darceleen, herself, never

4

used those descriptors and the continued use of them has confounded this litigation throughout its life. For the sake of our analysis, we will discard these labels as unhelpful and misleading. Elsewhere in this opinion, we will identify the person who was shot as Perp 1. The other home invader, the presumptive shooter, will be referred to as Perp 2. This will eliminate confusion.

From the very first interview, Darceleen has been consistent and certain that Perp 1 was thrown on her, bled on her clothes and in her home, and revealed his face when his bandana moved.

Darceleen has testified repeatedly that she learned from a televised news report that Bibbins was found dead from gunshot wounds suffered about the same time as Patrice's death. Quickly, she put Bibbins together with the crimes from the night before. On every occasion on which the question was raised, Darceleen testified that Bibbins' involvement in the murder and robbery made sense to her because she believed that Bibbins was one of two individuals who had been spotted trespassing in her yard a week before the murder. In testimony, she described the incident as an attempted break-in. The two people in the "attempted break-in" also wore bandanas to cover their faces according to neighbors who saw them. Darceleen testified that the neighbors' reports were on her mind when she put Bibbins together with Patrice's murder.

Darceleen testified in a deposition at the district attorney's office on January 13, 2010. She said that "a day or two after" her initial interview, she contacted Det. Morton to alert him to her belief that Gordon was not involved in her sister's death and that she had misidentified the assailant. Darceleen tried to explain, in her deposition, that she saw Perp 1's face only briefly during a struggle. When she saw his face, she thought it looked like Gordon. She testified that within a few

5

hours, Det. Morton showed her a photo lineup that included Gordon's picture. Darceleen explained that when she looked at the pictures, she was looking for Gordon and found him.

In the same deposition, Darceleen also explained why she thought Bibbins, not Gordon, was Perp 1. "Jonas,"[3] Darceleen's "cousin by marriage,"[4] was at her house at the time of the attempted break-in the week before the murder. It was her understanding that Bibbins and Jonas were best friends. Darceleen testified in the deposition that she suspected Jonas had set up the burglary and accused him of doing so. She testified that a neighbor told her he saw a strange white Ford Excursion parked near his house on the night of the attempted burglary. In response to Darceleen's accusation, Jonas admitted that "Jessie [Bibbins]" owned a white Excursion. The State's counsel in the deposition dismissed Darceleen rudely, telling her, "I can't go in and take a statement that I think is from a person who is less than honest."

Since her initial statement, Darceleen has been remarkably consistent in her recantation under oath before Gordon's murder trial and since. In the deposition described above, at a suppression hearing and two trials, Darceleen has continued to express her strong belief that Gordon was not Perp 1. Nevertheless, the state and the trial court implied that her testimony changed from her initial statement because of bribery or intimidation. The trial court convicted Gordon largely on the basis of Darceleen's initial statement, notwithstanding her recantation before trial.

***The re-investigation***

---

[3] The record does not reveal a full or formal name for Jonas.
[4] "Cousin by marriage" was Darceleen's description of her relationship to Jonas.

As noted above, Gordon requested post-conviction DNA testing in April 2019.  From the DNA findings and the stipulations regarding the ballistic characteristics of the bullets that killed both Patrice and Bibbens, we learn the following:

1.  Ballistics testing confirmed that the same 9 mm weapon ejected the two spent shell casings recovered from the Comadore residence.

2. Ballistic testing proved that the 9 mm slug that killed Patrice was shot from the same gun that killed Bibbins.

3. Bibbins' body was clad with a red bandana when it was found.  That is consistent with Taylor's description of one of the perpetrators.

4.  Bibbins was not shot at the home where his body was found, but instead was dropped there by an unknown male with dreadlocks. Gordon did not have dreadlocks.

5. A witness testified at Gordon's trial that the person who dropped Bibbins' body on the stoop was seen rendering first aid to him there. Investigators collected a blood soaked white t-shirt at the site where they found Bibbins' body.  It appeared that the t-shirt was used in an attempt to stop Bibbins' gunshot wound from bleeding.  The t-shirt had a stain on the collar that contained two sets of DNA. It is thirty-five times more likely that the DNA on the collar originated from two unknown individuals than from Gordon and one unknown individual.[5]

_____

[5] Bibbins was wearing a black t-shirt when his body was found.  It was soaked with his own blood.  The DNA from that blood was used as a source to match his blood on the white t-shirt and to compare to other tested items.  Results of DNA testing of the black t-shirt are not discussed here, as their value is solely to identify other items that bore his DNA.

6. A bloody latex glove was found with Bibbins' body. A DNA sample was taken from inside the glove. A DNA expert's report calculated that an unknown person is four-hundred-sixty times more likely than Gordon to be the contributor of the DNA.

7. The Smith & Wesson 40 caliber pistol[6] found at the Comadore home was tested along with its magazine and the 12 bullets in the magazine. Several areas of the gun were swabbed separately. The DNA extracts of those samples were combined for analysis. A DNA mixture of at least four contributors, two of whom were male, was detected in this analysis. Bibbins was likely one contributor to the mixed DNA samples. It is forty times more likely that the DNA on the pistol originated from four unknown individuals than from Gordon and three unknown individuals. It is seven times more likely that the DNA on the 40 caliber bullets originated from two unknown individuals than from Gordon and one other individual.

We repeat here for emphasis that the DNA results and other stipulations were adopted from the proceeding in which Gordon's conviction was vacated. None of them were contested at the trial court.

*Discussion*

In 2005, the legislature created the Innocence Compensation Fund. The fund was designed to compensate those who were wrongfully incarcerated by error or by other means. The statute is a common sense acknowledgment that when humans preside over a system of justice, errors will be made. The statute put safeguards in place to ensure that compensation would be paid only to those who are found to be factually innocent. Compensation is not intended for every person

---

[6] This gun is not the murder weapon. As noted above, the murder weapon was a 9 mm pistol.

who prevails on an appeal or other reversal of a verdict. The most important guardrails protecting the fund are set out in La. R.S. 15:572.8(A) and (B)

> A. A petitioner is entitled to compensation in accordance with this Section if he has served in whole or in part a sentence of imprisonment under the laws of this state for a crime for which he was convicted and:
>
> (1) The conviction of the petitioner has been reversed or vacated; and
>
> (2) The petitioner has proven by clear and convincing scientific or non-scientific evidence that he is factually innocent of the crime for which he was convicted.
>
> B. For the purposes of this Section, "factual innocence" means that the petitioner did not commit the crime for which he was convicted and incarcerated nor did he commit any crime based upon the same set of facts used in his original conviction.

These subparts must guide our analysis of the facts, which are largely stipulated by the parties before us. These same facts were sufficient to lead the trial court to vacate Gordon's conviction. Here we review them to determine whether they prove his factual innocence clearly and convincingly.

Against the scientific evidence (both DNA and ballistic), the state makes two arguments. First, the state continues to argue that Darceleen's recantation of her initial identification is not credible. Second, the state proposes that, "exclusion as a DNA contributor to [the] items [tested] carries absolutely no probative value." Both arguments are meritless.

While we believe Darceleen's recantation was the honest correction of an earlier error, we also note that under the factual scenario now before us, her testimony is not necessary to find that Gordon is clearly and convincingly factually innocent of the crime for which he was incarcerated.

Eyewitnesses identifications in criminal trials are often faulty. As of February, 2013 – The National Registry of Exonerations reported a total of 1,068 cases in which guilty verdicts were vacated. Eyewitness recantations were part of

9

250 of those exonerations.[7] A recantation such as Darceleen's is nearly commonplace.

The National Registry of Exonerations ("Registry") is a project of the University of California Irvine, the University of Michigan Law School, Northwestern University School of Law, and Michigan State University College of Law. It is partly funded by the U.S. Department of Justice. The Registry provides detailed information about every known exoneration in the United States since 1989—cases in which a person was wrongly convicted of a crime and later cleared of all the charges based on new evidence of innocence. The Registry reported the following regarding the frequency of errant eyewitness identifications:

> The Registry recently reexamined the first 1,365 exonerations we listed, those posted through April 2014. We found some type of false identification in 75% of the cases (1,018/1,365). Ninety of these exonerations included identification procedures that produced tainted identifications—7% of all exonerations and 9% of those with any type of misidentification.
> …
> In 57% of the tainted identifications we did find, the witnesses made mistakes (51/90), and in 43% they lied. The actual proportion of lies is probably higher, since we only coded an identification as a lie if we saw clear evidence of deception, and lying—like all misconduct—is often successfully hidden.

*Id.*

Darceleen consistently stated that Perp1 was shot and fell on her. She never identified Perp 2. That was never in question. She identified Perp 1 as Gordon. Gordon was not shot, therefore, it is certain that he is not the person she saw with his bandana momentarily lifted. Moreover, scientific evidence showed that Bibbins and Patrice were shot by the same gun. That fact is uncontested. It is possible that a person shot Patrice at her home, then shot Bibbins elsewhere and

---

[7] Kaitlin Jackson and Samuel Gross, *Tainted Identifications*, NAT'L. REG. OF EXONERATIONS, Sept. 22, 2016, https://www.law.umich.edu/special/exoneration/Pages/Features.Eyewitness.ID.aspx.

dropped him on a relative's steps and administered first aid to him. Common sense tells us that is unlikely. These circumstances alone support a finding that Gordon is innocent of the murder by clear and convincing evidence. The state's effort to recast Perp 2 as Gordon directly contradicts its argument that she correctly identified Gordon as Perp 1.

The State misses the point when it argues that Gordon's exclusion as a DNA contributor to the items tested carries "absolutely no probative value." Gordon's burden of proof is clear and convincing evidence of innocence, not proof beyond a reasonable doubt. Our Supreme Court defined the burden as follows:

> The Wrongful Conviction Compensation Statute requires proof of factual innocence by clear and convincing evidence. La. R.S. 15:572.8(A)(2). To meet the clear and convincing evidence standard, the petitioner must "prove the existence of a contested fact is highly probable, or much more probable than its non-existence." Talbot v. Talbot, 03-0814, pp. 9-10 (La. 12/12/03), 864 So.2d 590, 598. Thus, as properly framed by the court of appeal, "Mr. Jones has the burden of proving it is highly probable or much more probable than not that he did not commit the aggravated rape of A.H." Jones, 21-1205, p. 11, 348 So.3d at 780.

*Jones v. State*, 2022-01455, p. 6 (La. 5/5/23), 362 So. 3d 341, 345.

In another case of errant eyewitness identification[8] our court made clear that the burden of clear and convincing evidence can be met by showing a number of factors that so greatly undercut the likelihood of guilt that a rational person would not believe the petitioner committed the crime for which he was convicted. The Fifth Circuit succinctly described the plaintiff's burden of proof in a wrongful incarceration case, writing:

> First, the petitioner may produce probative, affirmative evidence that another person perpetrated the crime. Such evidence may be direct, e.g., when another person has confessed to or been convicted of the crime at issue, or circumstantial, e.g., photographs of a man who

---

[8] *State v. Ruano*, 2012-1517 (La. App. 4 Cir. 7/31/13), 120 So.3d 908.

better fits the description of the perpetrator. *See State v. Ruano*, 19-709 (La. App. 4 Cir. 3/4/19), 294 So.3d 44, 49.

*State v. Alexander*, 2022-12, p. 18(La. App. 5 Cir. 6/21/23), 367 So. 3d 867, 881.

Simply put, the DNA evidence does not point to Gordon, but away from him. Each item tested showed a significant likelihood that someone other than Gordon touched, bled or otherwise deposited the DNA harvested from those objects.

***Conclusion***

The only evidence that ever implicated Gordon was Darceleen's identification. Facts came to light within hours that led Darceleen to believe she had made a mistake. She quickly and readily admitted her change of heart to the police. As the investigation continued, it became clear that Darceleen's revised understanding was correct. DNA evidence is one more brick in the wall of evidence supporting Gordon's claim of innocence. In short, Gordon has presented facts that amount to clear and convincing evidence of his factual innocence. We must find that the trial court erred in its application of the burden of proof. We therefore reverse the judgment of the trial court and remand this case for assessment of compensation due to the petitioner.

**REVERSED AND REMANDED**